**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALEXIS FULLER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 07-C-6922** |
| **v.** | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE** | ) | |
| **Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Alexis Fuller seeks judicial review of a final decision denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II of the Social Security Act.[1]  Both parties filed motions for Summary Judgment and this Court must decide whether to reverse,  remand, or affirm.  For the following reasons, Ms. Fuller's motion to remand is granted [dkt 18] and the Commissioner's motion to affirm is denied [dkt 25].

PROCEDURAL HISTORY

On April 29, 2002, Ms. Fuller applied for DIB and SSI claiming disability since March 31, 2000.  She alleged in this application that her illness, "manic depressive," caused  high levels of stress and depression, an inability to think clearly, a lack of patience, and poor social skills.[2]  The Social Security Administration ("SSA") denied her application on October 4, 2002,[3] and denied her

---

[1] 42 U.S.C. § 405 (g).
[2] R. at 119.
[3] R. at 32.

request for reconsideration on May 1, 2003.[4] Ms. Fuller filed a timely request for a hearing on June

12, 2003.[5] Administrative Law Judge ("ALJ") Robert Asbille presided over two subsequent

hearings, the first on June 2, 2005,[6] and the second on October 6, 2005.[7] In his January 27, 2006,

decision, the ALJ found Ms. Fuller not disabled "at any time through the date of this decision."[8] On

February 21, 2006, Ms. Fuller filed a timely request for review with the Social Security Appeals

Council,[9] which was denied on March 16, 2007.[10] As such, the ALJ's denial of benefits stands as

the final decision of the Commissioner.[11]

## STATEMENT OF FACTS

Born February 18, 1972, Ms. Fuller was 33 years old at the time of her disability hearings.[12]

After she obtained a GED in 1992, Ms. Fuller completed a security officer training program[13] and

some college work.[14] She has worked in various jobs including veterinary assistant, cashier,

maintenance mechanic, carpenter, painter, waitress, retail clerk, and library clerk.[15] Ms. Fuller was

28 years old on her alleged disability onset date of March 31, 2000.[16] At the time of her hearings,

Ms. Fuller had one minor child and lived with her mother.[17] Ms. Fuller's long history of mental

health problems extended to her high school years when she was "sent ... away" to attend "a school

for troubled kids" and received "counseling about 3 times a week."[18] The record contains no

---

[4] R. at 38.
[5] R. at 42.
[6] R. at 538.
[7] R. at 565.
[8] R. at 29.
[9] R. at 17.
[10] R. at 11.
[11] R. at 12.
[12] R. at 30.
[13] R. at 125.
[14] R. at 147.
[15] R. at 120, 140, 153.
[16] R. at 119.
[17] R. at 545-46.
[18] R. at 126.

medical documentation from this counseling.

The medical record spans 12 years, contains documentation of disjointed treatment by many different physicians, and rarely indicates a continued course of treatment. For this reason, Ms. Fuller's medical history is best understood in chronological order, considering her then surrounding circumstances. Record pages 156-58 contain a portion of an unknown third party's disability application and are not discussed further in this opinion.

## A. Medical Records Dated Before The June 2, 2005, Hearing

Ms. Fuller's earliest medical records are dated January 20, and February 19, 1993, for treatment by Swielang Tan, M.D., when she was 21 years old.[19] Mrs. Fuller may have received a third or more treatments in August 1993;[20] these notes are partially illegible. Dr. Tan prescribed either Celexa 90mg, Wellburtrin, or possibly both.[21] While treatment notes do not discernibly diagnose a mental health disorder, Ms. Fuller later received these same prescriptions during psychiatric treatment elsewhere. Notably, Ms. Fuller referred to Dr. Tan as a current treating physician treating depression and prescribing Zoloft in her 2002 disability application.[22] However, the record contains nothing from Dr. Tan beyond 1993.

On April 7, 1996, because of suicidal ideation and depression, at age 24, Ms. Fuller went by ambulance to Christ Hospital and Medical Center Emergency Room.[23] Treatment notes revealed Ms. Fuller lived independently and was in a work-study program in her first year of college; her GPA was 3.49 in a biology science program.[24] The treating emergency room physician noted Ms.

---

[19] R. at 160.
[20] R at 161.
[21] R. at 160-61.
[22] R. at 124.
[23] R. at 166.
[24] R. at 172.

Fuller complained of depression for two months and current suicidal ideation; she stated that she owned a gun but gave it to her cousin to avoid using it.[25] Discharge instructions read: "[c]ommit to mental health center."[26]

Consequently, Ms. Fuller was taken to Tinley Park Mental Health Center ("TPMHC") to be admitted into inpatient care the same day. The treating physician performed a comprehensive psychiatric evaluation[27] and diagnosed Ms. Fuller with adjustment disorder; depressive mood; some difficulty in social, occupational, or school functioning; and a Global Assessment Functioning score ("GAF") of 61, indicating mild symptoms or impairments.[28] The GAF is an indicator of psychological, social, and occupational functioning assigned by a mental health professional where scores between 41-50 indicate serious, 51-60 indicate moderate, and 61-70 indicate mild symptoms or impairments in social, occupational, or school functioning.[29] Ms. Fuller applied for voluntary admission but was denied, ostensibly not because she lacked insurance[30] and TPMHC's daily charge was $260,[31] but because "it was felt that she was not in need [of] inpatient treatment at this time."[32] Before discharge, TPMHC set a next-day appointment for Ms. Fuller at Southwest Mental Health Clinic but the record does not indicate she went.[33]

Treatment notes indicated that Ms. Fuller admitted occasional use of marijuana, occasional consumption of "wine coolers," and at least one use of cocaine.[34] She reported sleep problems and

---

[25] R. at 167.
[26] *Id.*
[27] R. at 171.
[28] R. at 172.
[29] *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders IV-TR* 34 (4th ed. 2000).
[30] R. at 164.
[31] R. at 181.
[32] R. at 203.
[33] R. at 175.
[34] R. at 174.

eating disturbances.[35]    The notes further indicated that Ms. Fuller "is well groomed, neat," "memory is intact," "no thought disorder displayed," "attitude is appropriate,""has insight and good judgment," however "patient is depressed," and is "willing to have counseling and Rx for her depression."[36]

The next documented treatment occurred the following year, for crisis intervention. On April 16, 1997, Ms. Fuller presented to Chatham-Avalon Mental Health Center ("Chatham") and received a comprehensive mental health assessment.[37] She expressed fear of failing out of school because of an extended absence; she had not returned to class for three weeks following spring break.[38] Ms. Fuller sought and received treatment four times at Chatham from April to May 1997.[39] Her treating physician prescribed Prozac and Ambien and assigned a GAF between 65 and 70 but deferred a diagnosis.[40]

Treatment notes revealed she suffered physical and mental abuse as a child,[41] and addressed her goals: she "wants to be able to sleep at night," and seeks "to return to normal," because she has "been unable to study," and "has difficulty reading and retaining information."[42] At this time, Ms. Fuller's reported use of alcohol is weekly, her use of marijuana is one time monthly, and she reported having used cocaine one time, perhaps unintentionally, "one joint laced with coke."[43] In addition, Ms. Fuller's "mood and affect were stable" and she denied suicidal/homicidal thoughts.[44] On May 2, 1997, her fourth and final treatment at Chatham for this period, treatment notes indicated

---

[35] R. at 169.
[36] R. at 172.
[37] R. at 225.
[38] R at. 218.
[39] R. at 204.
[40] R. at 216.
[41] R. at 220.
[42] R. at. 218.
[43] R. at 121.
[44] R. at 225.

she requested medical documentation to withdraw from school, presumably to avoid imminent failing grades.[45] Ms. Fuller did not continue her recommended course of treatment at Chatham and her file was closed on June 20, 1997.[46]

Over the next four and half years, the only medical records presented are for Ms. Fuller's miscarriage and pregnancy care, without mention of any mental health concerns.[47] Ms. Fuller's alleged disability onset date, March 31, 2000, falls within this time frame.[48]

On October 11, 2001, Ms. Fuller presented to Christ Hospital and Medical Center Emergency Room due to a strong headache with pain radiating into her neck and shoulder, which had persisted for three weeks, and was accompanied by blurred vision.[49] Ms. Fuller received a CT (Cat or Computed Tomography) Scan of her brain resulting in "no significant findings,"[50] and was prescribed Vicodin.[51] Ms. Fuller's discharge papers indicated her diagnosis: "Muscle Contraction Headache: This is a headache caused by tight, cramping muscles around the head and neck. Anything that can increase muscle tension can make it worse," and "emotional problems may cause muscle tightness. Feel free to discuss problems with your doctor."[52] In the psychiatric field of his treatment notes, emergency room physician Daniel Girzadas, M.D., indicated: "No depression, No suicidal ideation, No homicidal ideation."[53] It is unclear from this entry, one field among thirteen in the ROS (Review of Symptoms) section, if Ms. Fuller affirmatively denied any mental health problems or if she simply failed to complain of them.

---

[45] R. at 231.
[46] R. at 215.
[47] R. at 257-309.
[48] R. at 522.
[49] R. at 323.
[50] R. at 336.
[51] R. at 326.
[52] R. at 329.
[53] R at. 337.

Less than a month later, on November 7, 2001, Ms. Fuller returned to Christ Hospital and Medical Center Emergency Room for injuries sustained in a physical altercation with another woman including scratches and abrasions to face and hands, injured foot and ankle, lacerated finger, and scratches and abrasions to knees.[54]  Ms. Fuller's foot was injured while trying to escape when the pursuing female ran it over with a car.[55]  Radiology reports of her foot and ankle did not reveal a fracture.[56]  While these records do not evaluate Ms. Fuller's mental health they do bear on her later testimony that she frequently gets into fights with people and has problems with anger.  Ms. Fuller applied for SSI and DIB on April 29, 2002.

Next on September 3, 2002, Ms. Fuller presented to Community Mental Health Council ("CMHC"), seeking treatment.[57]  Treatment notes described her symptoms as "serious depression, sadness everyday, crying (tearful during interview), agoraphobia (10-15 days duration at times), anger, lack of energy, insomnia, trapped and helpless feelings" over the past six months and "worsening with time."[58]  Two documents, both dated September 3, 2002, assigned conflicting GAF scores of either 50[59] or 55.[60]  Her various diagnoses at this time were major depression, single, moderate; dysthymic disorder; agoraphobia; and personality disorder NOS.[61]  Other relevant findings included: occasional use of marijuana and cocaine; affirmative ability to obtain a job but inability to retain jobs due to anger; unproductive performance of daily activities; impaired reasoning, insight, and judgment; adequate care for self and 2 year old; "potential for productive

---

[54] R. at 311.
[55] Id.
[56] R. at 317.
[57] R. at 465.
[58] Id.
[59] R. at 470.
[60] R. at 469.
[61] Id.

lifestyle if treated;" and preoccupation with sense of victimization, helplessness.[62]

Shortly after her first treatment at CMHC, Ms. Fuller submitted to a psychiatric evaluation by Harley Rubens, M.D., on September 9, 2002, at Lake Shore Medical Clinic. The SSA requested this evaluation to obtain additional medical evidence and rule on Ms. Fuller's application claiming disability.[63] Ms. Fuller described her symptoms as trouble sleeping, low energy, irritability, forgetfulness, excessive arguing and fighting with other people.[64] She also disclosed a previous suicide attempt from her teenage years.[65] Dr. Rubens diagnosed borderline personality disorder and indicated Ms. Fuller did not seem able to manage her own funds.[66] Dr. Rubens also found that Ms. Fuller made one overt paranoid statement[67] but that her memory was good, and her speech was normal.[68] Ms. Fuller revealed to Dr. Rubens that she "was in jail for battery in 1995" and inexplicably that she did well in college and left because she, "simply lost interest in it."[69] These statements contradict other parts of the record. Ms. Fuller testified at her hearing that she had been arrested, but never jailed,[70] and medical records from Chatham in 1997 indicated she withdrew from school because of excessive absenteeism due to her mental health crisis.[71]

State agency psychologist, Kirk W. Boyenga, Ph.D., reviewed Ms. Fuller's medical records on September 25, 2002, and concluded that she was capable of performing simple, detailed tasks.[72] Dr. Boyenga wrote that he relied on evidence that Ms. Fuller lived independently and supported her

---

[62] R. at 465-69.
[63] R. at 341.
[64] R. at 339.
[65] Id.
[66] R. at 341.
[67] R. at 339.
[68] R. at 340.
[69] Id.
[70] R. at 573.
[71] R. at 218, 231.
[72] R. at 345.

children in order to reach his conclusion.[73] Dr. Boyenga also concluded that Ms. Fuller was capable of performing routine, repetitive tasks. He supported this conclusion with evidence that Ms. Fuller was able to travel independently.[74] Dr. Boyenga assessed the following functional limitations: mild restriction of activities of daily living; moderate difficulties in maintaining social functions; mild difficulties in maintaining concentration, persistence, or pace.[75] It is not clear whether or not Dr. Boyenga had a copy of Ms. Fuller's most recent 2002 evaluation at CMHC, or her recent emergency room records (prolonged tension headache and injury due to physical altercation) in making his functional capacity assessment. His notes clearly referred only to records from TPMHC in 1996, CMHC in 1997, and Dr. Rubens' recent September 2002 evaluation.[76]

After a long gap in treatment and two missed appointments, Ms. Fuller returned to CMHC for treatment three more times the following year. She received treatment on May 1, May 27, and August 6, 2003, but missed scheduled appointments on February 6, April 1, and September 3, 2003.[77] The long gap in treatment sessions at CMHC spanned eight months, from her initial visit on September 3, 2002, to May 1, 2003. It is unclear whether or not Ms. Fuller followed up for additional treatment after her initial visit; either the record is missing documentation or a follow up appointment was not set for her. There is no record showing a missed appointment until February 6, 2003. However, during this gap Ms. Fuller did seek treatment elsewhere. On November 13, 2002, Ms. Fuller went to the emergency room at Jackson Park Hospital for depression.[78] The treating physician diagnosed her with major depression and prescribed Paxil.[79]

---

[73] *Id.*
[74] *Id.*
[75] R. at 357.
[76] R. at 359.
[77] R. at 471-78.
[78] R. at 361.
[79] R. at 374.

Ms. Fuller then missed two scheduled appointments at CMHC from February to April 2003. She received treatment on May 1, 2003, which entailed a psychiatric evaluation.[80] Treatment notes stated, "she tried to get help but failed out of treatment twice," and also stated that she only took her medications for a few weeks at a time, and that her depression would come and go.[81] The notes described that: she had trouble sleeping, she felt hopeless, "she [wa]s petrified," she had no energy, she would worry excessively, and she had problems with her temper and would become enraged.[82] Further, she denied suicidal thoughts and admitted marijuana and cocaine use.[83] The treating psychiatrist diagnosed Ms. Fuller with dysthymia, generalized depressive disorder, deferred any further diagnosis, prescribed Effexor and assigned a GAF of 50.[84] Notably, the "Number 1" item on the physician's treatment plan was to "obtain medical records."[85]

On the next treatment date, May 27, 2003, the same treating psychiatrist indicated slight improvement in Ms. Fuller's depression and anxiety, and credited her medication. However, due to bad side-effects, the physician changed her prescription from Effexor to Celexa. Treatment notes described patient's affect as sad and depressed and described her voice as soft and monotone.[86]

Her next treatment date at CMHC was August 6, 2003.[87] Ms. Fuller stated that she had been out of medicine for a month and that "things have been very bad over past month."[88] She admitted occasional marijuana use, her most recent use in March of 2003. Traci Powell, M.D., refilled Ms. Fuller's Celexa prescription and scheduled another appointment in 4 weeks. Dr. Powell diagnosed

---

[80] R. at 478.
[81] R. at 476-78.
[82] Id.
[83] R. at 475.
[84] R. at 477-78.
[85] R. at 476.
[86] Id.
[87] R. at 473.
[88] Id.

dysthmia, major depressive disorder, and generalized anxiety disorder. Her assessment included "occupational problems" and a GAF of 55-60.[89]

On September 3, 2003, one year to the day after her first visit to CMHC, Ms. Fuller missed her final scheduled appointment and her medication was discontinued. Dr. Powell ordered CMHC to try to reschedule and to send a letter.[90]

On March 3, 2004, Ms. Fuller saw Theodore Stern, M.D., of Saint Margaret Mercy Medical Associates ("St. Margaret") for treatment of an asthma flare up, for which he prescribed Advair 250/50.[91] Dr. Stern noted that Ms. Fuller was then seeing "Prairie Services"[92] for general anxiety disorder and taking Celexa.[93] While CMHC is a Grand Prairie Services facility[94] ("Prairie Services"), Ms. Fuller's medical records from CMHC indicate she had not been seen there for the previous eight months.

On September 1, 2004, Ms. Fuller saw Crystal Kelly, M.D., of St. Margaret who performed a well-gyn exam and prescribed Wellbutrin, 100mg twice a day for continuing adjustment disorder.[95] On September 29, 2004, she saw Dr. Kelly again for issues unrelated to mental health.[96] On October 8, 2004, Ms. Fuller saw Dr. Kelly for pain in her lower abdomen and Dr. Kelly recorded "past history is significant asthma, obesity, and [gastroesophageal reflux disease] GERD."[97] Dr. Kelly also recorded Wellbutrin as a continuing medication but made no mention as to her mental health.[98]

Four months later, on February 18, 2005, Ms. Fuller entered inpatient treatment at a Prairie

---

[89] *Id.*
[90] R at 472.
[91] R. at 507.
[92] R. at 508.
[93] R. at 507.
[94] R. at 371.
[95] R. at 501.
[96] R. at 499.
[97] R. at 496.
[98] *Id.*

Services facility, the Emergency Mental Health Center ("EMHC").[99]  According to a note dated February 27, 2005, she had not yet been released and a release date had not yet been determined.[100]  Besides this note, there are no medical records from her inpatient stay.  The medical record supplied from EMHC at this time begins with a psychiatric evaluation on March 1, 2005.  This evaluation assigned a GAF of 50, diagnosed  bipolar[101] and recommended a substance abuse assessment based on Ms. Fuller's disclosure of past marijuana use and continuing alcohol usage described as "daily drinking."[102]  This evaluation mentioned "seizure" and "head trauma" in the illnesses and injuries category.[103]

Ms. Fuller presented to EMHC three more times from March to May 2005.  Physician notes for these follow-up treatments contain the following information: her March 30 appointment increased her Seroquel prescription and either added or renewed her Lamictal prescription (bipolar medication);[104] her April 13 appointment assigned  a  GAF of 60, and continued both medications;[105] her April 18 appointment continued both prescriptions and the treating physician commented "work wants projected return date;"[106] and her May 11 appointment assigned a GAF of 60, continued both prescriptions, and treating physician commented "her medical card does not pay for Seroquel.  Advised to bring letter she received from public aid office."[107]

On May 16, 2005, South Suburban Hospital Emergency Department treated Ms. Fuller for a hiatal hernia, a weak spot in the muscle between the lungs and stomach, which "can be quite

---

[99] R. at 371.
[100] *Id.*
[101] R. at 484.
[102] R. at 482.
[103] R. at 481.
[104] R. at 486.
[105] R. at 489.
[106] R. at 488.
[107] R. at 487.

uncomfortable."[108] The last medical record dated before her first hearing is a doctor note dated May 19, 2005, from a physician with a Prairie Services facility, presumably EMHC, stating that Ms. Fuller, "is under my care and in my opinion she is not in stable condition and she cannot return to/or work."[109]

## B. The June 2, 2005, Hearing

Ms. Fuller's first hearing before the ALJ took place on June 2, 2005, in Evanston, Illinois. She appeared in person with her attorney, John E. Horn, to testify at the hearing. Vocational Expert ("VE") James Radke and Medical Expert ("ME") Jospeh Cools, a clinical psychologist, testified as well.[110] Mr. Horn informed the court of his ongoing difficulties obtaining certain medical records from Cook County Department of Health and requested that the record be held open after the hearing so he could supplement it with the missing records. The ALJ agreed.

Ms. Fuller testified first. She testified that her physical health problems included severe asthma requiring the use of a home nebulizer, a hiatal hernia, ulcers, and chronic back pain from a car accident.[111] She further testified that she lived with her mother, and that she would get nervous and angry when she drives a car which has resulted in her hitting the horn, swearing, rolling down her window to yell at other drivers, and even throwing a can of soda at another car.[112]

Ms. Fuller next testified about her education and work experience concerning periods both before and after her alleged onset date of March 31, 2000. Ms. Fuller stated that she last worked in February 2005, in her part-time clerk position at the South Holland Library, but that she was not

---

[108] R. at 439.
[109] R. at 438.
[110] R. at 538.
[111] R. at 544.
[112] R. at 546.

currently working.[113]  She testified that prior to her alleged onset date, she worked as a maintenance mechanic at Quality Croutons, as a waitress at Leona's Pizza, as an untrained painter and carpenter for her mother, and very briefly for a company named Allied Inventory.[114]

When asked why she could not work now, Ms. Fuller described her symptoms.  She testified to crying spells, mood swings, problems focusing and concentrating, lack of energy,  memory problems,  forgetfulness in the midst of a task as to that task, not eating when severely stressed, sometimes wanting to hurt herself, and sometimes feeling like other people are talking about her.[115]  Ms. Fuller also testified to having very few friends.[116]

When asked about drug use, Ms. Fuller testified that she does not often drink alcoholic beverages, that she has never had trouble with alcohol, and that she does not use street drugs.[117]  Ms. Fuller testified that she has trouble sleeping, can sometimes cook for herself,  that she washes and dusts to help her sister with housework, and that it takes "everything I have" to get up in the morning.[118]

Under her attorney's examination, Ms. Fuller testified that she is not comfortable around people and so she preferred to stay at home.[119]  She testified as to her current medication: 200 mg Lamictal, 400 mg Seroquel, Advair 550, Albuterol through a home nebulizer, and Prevacid (for stomach ulcers).[120]  She testified that her stress level can aggravate her asthma.[121]

Ms. Fuller testified to problems she had at her most recent job as a library clerk such as

---

[113] R. at 547.
[114] R. at 549.
[115] R. at 549-50.
[116] R. at 550.
[117] R. at 551.
[118] *Id.*
[119] R. at 552.
[120] R. at 553.
[121] R. at 554.

feeling scrutinized by other employees because of her race (African American) because "it's a Dutch-run town" and "they weren't very fond of employing blacks."[122] Ms. Fuller also stated that she misfiled items because she was unable to "pay really close attention" to the numbers "at the end of things" and that even though she carefully wrote down her shifts, she sometimes just forgot she had to work.[123]

Ms. Fuller then described a situation when she confronted a co-worker who she thought had checked library material out on her card as a set-up to get her into trouble. She testified that, "I immediately suspected her and asked her if she could help me with something, and I wanted her to help me explain why the video was on my account. And back and forth, back and forth until she got angry enough that she just told me she didn't F-ing do it."[124] She testified that she was not currently working because she "went to the crisis center"[125] after a "really vicious argument" with her mother that made her feel suicidal.[126]

ME Cools testified next. ME Cools testified that "despite the size of the record, there's very little medical evidence regarding the severity of the depression, personality disorder, or functional limitations."[127] In light of the fact that the record was to be supplemented with additional medical records, ME Cools preferred not to opine on the extent of Ms. Fuller's impairments. He felt "if she's been in treatment for a long period of time" the missing records would help, given that a "psyche C.E." from 2002 "would not have precluded her from working."[128] Presumably, the ME was referring to Dr. Rubens' September 9, 2002, evaluation.

---

[122] R. at 556.
[123] R. at 558.
[124] R. at 557.
[125] R. at 558.
[126] R. at 557.
[127] R. at 559.
[128] *Id.*

Next the ALJ examined VE Radke.  VE Radke classified Ms. Fuller's previous jobs according to the required physical demand and the required skill level.[129]  The ALJ posed a hypothetical question asking VE Radke if someone of the same age, education, and work experience as Ms. Fuller, if limited to "simple, routine tasks with only occasional exposure to the general public, co-workers, and supervisors" could find employment in the national economy.[130]  VE Radke identified the positions of kitchen-worker/dishwasher, maid, mail clerk, and assembler as available in abundant numbers and appropriate for such a person.[131]  The ALJ next asked the VE if his answers were consistent with the Dictionary of Occupational Titles ("DOT"), to which the VE responded yes.[132]

Mr. Horn questioned the VE next.  Counsel stated that a moderate impairment in concentration would take someone off task for up to a third of the day, and as a result he or she would be unemployable in the jobs previously identified.  VE Radke agreed with this statement.[133]

## C. Medical Evidence Dated After The June 2, 2005, Hearing

On June 29, 2005, Ms. Fuller submitted to a Psychiatric Evaluation for the Bureau of Disability Determination Services, performed by Mrytle Mason, M.D., M.P.H.[134]  Dr. Mason reviewed Ms. Fuller's  medical record of over 300 pages for 25 minutes and examined her for 40 minutes.[135]  Dr. Mason explored Ms. Fuller's depression, anxiety, stress,  past suicide attempts, personal history, education, social life, legal history, daily activities, and other areas of her life.  Dr. Mason diagnosed Ms. Fuller with anxiety disorder and depressive disorder, mood congruent

---

[129] R. at 560
[130] R. at 561.
[131] *Id.*
[132] R. at 562.
[133] R. at 563.
[134] R. at 443.
[135]*Id.*

delusions and assigned a GAF of 60.[136]  Dr. Myrtle found that Ms. Fuller was not limited in her ability to understand, remember, and carry out instruction[137] and that she was also not limited in her ability to respond appropriately to supervision, co-workers, or work pressures.[138]  However, Dr. Myrtle did find that Ms. Fuller was limited in her capability to "travel alone" because she was, "fearful, panicky," and that she was limited in her capability of "being around others" because her "thinking is barely stable, could disintegrate."[139]  Dr. Myrtle did not make a finding as to episodes of decompensation and has multiple answers scratched out where the original box she checked would indicate a higher level of impairment.[140]

On August 5, 2005, Ms. Fuller presented to St. Margaret and physician notes showed that: she was continuing to take Seroquel to treat bipolar and Prevacid to treat GERD; she was working on her diet and exercise to combat obesity; and she was working on cessation of smoking.[141]  On August 10, 2005, at St. Margaret, Ms. Fuller received a radiology examination of her chest because of continued shortness of breath.  The results did not reveal any problems with her lungs, diaphragm, heart, or aorta.[142]  Ms. Fuller returned to St. Margaret on August 23, 2005, at which time physician notes indicated: she was continuing to take Seroquel for bipolar and Prevacid for GERD; she was continuing to work on her diet and exercise to combat obesity, and she was still working on cessation of smoking.[143]

**D. The October 6, 2005, Hearing**

---

[136] R. at 448.
[137] R. at 450.
[138] R. at 451.
[139] *Id.*
[140] R. at 443-52.
[141] R. at 492.
[142] R. at 510.
[143] R. at 491.

17

Ms. Fuller's second hearing took place in Evanston, Illinois, on October 6, 2005, again before ALJ Robert Asbille. Ms. Fuller, ME Daniel Schiff, M.D., and VE Linda Gels testified at the hearing. The ALJ's opening statement expressed concern regarding the recent June 29, 2005, psychiatric evaluation performed by Dr. Myrtle because it contained internally-inconsistent functional limitations. Identifying the inconsistencies, the ALJ said: "[Dr. Myrtle] says fearful, panicky, thinking is barely stable. Could disintegrate. Didn't strike me that that was consistent with somebody that had (Inaudible) [no] limitations."[144] The ALJ said he needed the benefit of expert testimony to "clear up what exactly [s]he meant by all of that."[145] Mr. Horn mentioned that he supplemented the record with additional records[146] and that he was anxious to hear what ME Schiff had to say.

Ms. Fuller testified first and affirmed she had a license, lived with her mother, and easily angered in traffic. Ms. Fuller added that her medication helped her not get angry as fast or "as explosive" but that it remained a problem.[147] Ms. Fuller clarified her earlier testimony that she stopped working at the library, her most recent job, because she "had a really bad episode and ended up in the crisis center for almost two weeks."[148] Ms. Fuller attempted to explain why she would go off her medication in the past by stating, "[w]ell, I had felt better."[149] She repeated testimony about walking away from and forgetting about food cooking on the stove. Ms. Fuller testified that she had tried to hurt herself, had hit people, and had been arrested more than once, but that she had not served jail time.[150] When asked about street-drug use, Ms. Fuller testified that it had been, "maybe

---

[144] R. at 567.
[145] Id.
[146] R. at 464-89 (July 15, 2005, letter to ALJ submitting medical records of treatment at Chatham from September 2002 to September 2003).
[147] R. at 571.
[148] Id.
[149] R. at 572.
[150] R. at 573.

about seven or eight years" since she had "used any of those things."[151]

The ALJ confirmed that Ms. Fuller was physically shaking during her testimony. She ascribed this to nervousness, and that she gets nervous when she is around people.[152] Further, Ms. Fuller testified that she washed dishes, swept, and mopped, but that she does not iron, vacuum, wash clothes, cook, or go to parent teacher conferences.[153] She said her mother goes to those for her.[154]

Next, Mr. Horn questioned Ms. Fuller and confirmed that she only would drive alone to get her son to school, which is only a couple blocks around the corner and only if the weather was very cold.[155] Ms. Fuller testified that she misfiled things at her previous job at the library, forgot to check items in, forgot to come to work sometimes, and had suspicions about the way other people view her.[156]

ME Schiff testified next. He opined that the inconsistency of the record made it very difficult to summarize but that he saw two predominant issues: mood disorder and substance abuse.[157] He observed Ms. Fuller's claim that she had not used street-drugs for seven or eight years was simply untrue in light of multiple admissions to the contrary found in the medical record.[158] ME Schiff said that the next most important repetitive diagnosis was depression, "variously characterized as major depression or dysthymia."[159] ME Schiff summarized his opinion: "[t]o sum up, I think she has had inconsistent mental status exams, inconsistent diagnoses, inconsistent

---

[151] R. at 574.
[152] R. at 575.
[153] R. at 576-77.
[154] *Id.*
[155] R. at 578.
[156] R. at 579.
[157] R. at 580.
[158] *Id.*
[159] R. at 581.

complaints, and certainly inconsistent compliance with medication ... [t]hat's where I'm stuck."[160]

The ALJ asked the ME a long series of questions attempting to have ME Schiff evaluate the extent of Ms. Fuller's condition without considering her drug or alcohol use. First he asked if "the fact that her situation kind of goes up and down" could explain the record's inconsistencies.[161] The ME said that was possible but her medical history could also be explained by factoring in her drug use because street-drugs are "adulterated with all sorts of things" and "you can get various reactions from the chemicals of abuse."[162] The ALJ next specifically asked the ME to disregard Ms. Fuller's use of alcohol and drugs, and to determine if she meets the official listings. The ME said that, "at times, she probably would."[163] Next the ALJ asked if Ms. Fuller could work a full eight hour day, but the ME responded with a question: "[i]f she were not abusing chemicals?"[164] The ALJ instructed the ME not to consider drug use, but to look "at her total picture taking ... everything together."[165] The ALJ further asked the ME: "[i]s she able to get along with supervisors and coworkers?"[166] But again the ME did not ignore Ms. Fuller's history of drug use; he said: "[i]t depends on what chemical. If she was under the influence of cocaine, it could make her mighty irritable."[167]

The ME emphasized that the medical record does not show a long course of treatment, making it very difficult to assess to what degree Ms. Fuller's conditions would respond to long term treatment. ME Schiff testified that Ms. Fuller was moderately limited in activities of daily living, moderately to markedly limited in social functioning, and mild to moderately limited in

---

[160] *Id.*
[161] R. at 582.
[162] *Id.*
[163] *Id.*
[164] *Id.*
[165] *Id.*
[166] R. at 583.
[167] *Id.*

concentration, persistence, and pace.[168] After extensive questioning surrounding the possible effects of Ms. Fuller's drug and alcohol use, ME Schiff came to the conclusion that he could not confirm even the existence of a mood disorder independent of Ms. Fuller's substance abuse due to the episodic nature of the her medical records.[169]

VE Gels testified that an individual of Ms. Fuller's age, education, and work experience, limited to simple routine tasks and occasional contact with the general public, co-workers, and supervisors could work as a cleaner, housekeeper, or hand packager.[170]

**E. Subsequent Medical Evidence**

Following both hearings, Mr. Horn submitted an October 26, 2005, prescription for Ms. Fuller from a Prairie Services physician for Zolft and Lamictal and consented at this time that the record be closed.

---

[168] R. at 584.
[169] R. at 590-97, 603-05.
[170] R. at 610.

**F. The ALJ's Decision**

In his decision dated January 27, 2006, the ALJ determined that Ms. Fuller was not disabled. For purposes of DIB a person is disabled if unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment."[171] The ALJ's decision followed the requisite five-step evaluation process,[172] ultimately denying benefits at step five. To establish Ms. Fuller's eligibility, the ALJ determined that she was insured for benefits through June 30, 2004.[173]

At step one, the ALJ determined that Ms. Fuller had not engaged in substantial gainful activity since her alleged onset date. At step two, the ALJ found Ms. Fuller's impairments qualified as "severe" such that they "significantly limit an individual's physical or mental ability to do basic work activities."[174] At step three, the ALJ recognized that, because her impairments qualified as "severe," he must consider "all medically determinable impairments...in the remaining steps of the sequential analysis."[175] The ALJ's analysis summarized evidence regarding Ms. Fuller's physical and mental impairments, and then set forth his reasoning and determinations.

Regarding Ms. Fuller's physical impairments the ALJ mentioned evidence of her asthma, stomach ulcers, GERD, foot injury, abdominal pains, and her two emergency room visits for back pain and for a hiatal hernia.[176] The ALJ indicated that each of her physical ailments was either under control with medication (ulcers, GERD, hernia), or lacked follow up treatment (back pain, abdominal pain), and that she continued to smoke cannabis and cigarettes while suffering severe asthma.

---

[171] R. at 21.
[172] *See* 20 C.F.R. §§ 404.1520, 416.920.
[173] *See* 41 U.S.C. §§ 423(c)(1)(B)(3), 416(i)(3)(B)(ii) (setting forth the eligibility requirements for an individual claiming DIB for a period before attaining the age of 31).
[174] R. at 22.
[175] R. at 23.
[176] *Id.*

The ALJ next analyzed Ms. Fuller's mental impairments but did not consider that some of her physical conditions could be symptoms of, or otherwise caused by, her mental impairments. He began with her records from April 1996 at TPMHC, and noted that she "was not deemed a candidate for inpatient treatment that time."[177] The ALJ noted that Ms. Fuller did not seek additional treatment until the next year when was diagnosed with depression, and prescribed Prozac and Ambien.[178]

The ALJ attempted to move forward chronologically, next considering Dr. Rubens' September 9, 2002, evaluation "as part of the Administration's attempt to gather medical evidence."[179] The ALJ wrote this was "the next time claimant presented for psychiatric consultation."[180] The ALJ summarized Dr. Rubens' evaluation and acknowledged the conclusion that she could continue to perform routine, repetitive tasks.[181] He cited her diagnosis – borderline personality disorder – and accompanying symptoms: "poor sleep, decreased energy, irritability and forgetfulness;" "some paranoid tendencies;" her reliance on her mother to cook for her and her son; and that "she stayed at home all the time."[182] The ALJ mentioned the medical opinion that Ms. Fuller's "attention and concentration were diminished, and her judgment was poor" and that "her memory was intact."[183] The ALJ, however, did not acknowledge Dr. Rubens' medical opinion that Ms. Fuller seemed incapable of managing her own funds.

The ALJ next evaluated a treatment record from CMHC on September 3, 2002, specifically a complete psychiatric exam. The ALJ recounted Ms. Fuller's diagnosis: "major depression: single,

---

[177] *Id.*
[178] *Id.*
[179] *Id.*
[180] *Id.*
[181] R. at 24.
[182] R. at 23-24.
[183] R. at 24.

moderate; dysthymic disorder; and personality disorder."[184] He noted that her GAF was 55, and that

she was prescribed Effexor and later switched to Celexa. Next, the ALJ summarized her emergency

room treatment in November 2002 when Ms. Fuller presented for depression and anxiety and

received a prescription for Paxil.[185]

The ALJ moved on to Ms. Fuller's treatment at CMHC in August 2003 and emphasized that

her GAF "had risen to 55-60, even though she had run out of medication one month earlier."[186] The

ALJ noted Ms. Fuller failed to continue her treatment at CMHC the following month.

The ALJ also recounted Ms. Fuller's treatment from March to May 2005 at EMHC. It is

unclear if the ALJ realized, or if he simply chose not to mention, that Ms. Fuller received inpatient

treatment in Februrary 2005; he simply stated she "was treated" there.[187] The ALJ summarized this

course of treatment noting a GAF of 50, the severity rating of her symptoms as a 2 on a scale of 1-5,

and her prescriptions for Lamictal and Seroquel. The ALJ noted the discontinuation of Seroquel and

replacement with Zoloft in October 2005.[188] He also noted the lack of records from May to October

2005 and concluded it was unclear if she was seen during this time.

The ALJ next mentioned Ms. Fuller's June 2005 psychiatric evaluation with Dr. Myrtle.[189]

The ALJ noted some of Ms. Fuller's claims from this evaluation such as fear of crowds, anger,

inability to cook, suicidal ideations, trouble concentrating, and trouble making decisions. The ALJ

stated her diagnosis at this time was "anxiety and a depressive disorder with mood congruent

delusions" and that her GAF was 60.[190] The ALJ also noted Dr. Myrtle's opinion that functionally,

---

[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.*
[190] *Id.*

Ms. Fuller was limited by an inability to travel alone or work in close proximity to other people.[191] This concluded the ALJ's review of the record.

The ALJ's findings based on this evidence were that "claimant has depression, dysthymia, mild agoraphobia (she goes to work part-time), asthma, and substance abuse" which he found severe but not "severe" enough to meet, "either singly or in combination" a listed impairment. The ALJ stated that while ME Schiff testified that claimant's impairment satisfied the criteria of a listing, he was "equivocal as to whether cessation of substance abuse would improve her functioning." Regarding her mental impairments, the ALJ concluded Ms. Fuller's mental residual functional capacity ("MRFC") as such: "claimant is moderately limited in her ability to perform daily activities and in her social functioning; mild to moderately impaired in concentration, persistence and pace; and has experienced one or two episodes of decompensation."[192]

Moving on to his full residual functional capacity ("RFC") analysis, the ALJ recognized that he must "consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR §§ 404.1529 and 416.929 and Social Security Ruling 96-7p," and that he must "also consider any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairment and resulting limitations."[193]

The ALJ summarized some of claimant's testimony such as her fear of being in public, her frustration in traffic, her reliance on her mother to attend parent-teacher conferences, her impaired concentration and memory, her mood swings, her decreased appetite, her problems with authority,

---

[191] *Id.*
[192] R. at 25.
[193] *Id.*

her lack of friends, and her disinclination to bathe or get up in the morning.[194]  In his analysis, the ALJ discounted claimant's testimony based on the fact that "notably, claimant currently works part-time," and contrary to her claims of social dysfunction that "it is interesting...just about every job claimant has ever held has involved rather extensive interpersonal contact."[195]  The ALJ next concluded that "claimant generally does well on mental status evaluations."[196]  He noted she was described as intelligent, has some college credit, and found that, "[i]n sum claimant is a bright young woman with a lot of problems, and she has trouble working around other people."[197]  As part of his analysis, the ALJ noted that "the issue of cannabis is also a sticking point" and described Ms. Fuller's inconsistent testimony as to drug use.[198]

At step four, the ALJ determined what Ms.Fuller could still do despite her limitations, or her RFC.[199]  The ALJ concluded: "claimant retains the following residual functional capacity; 'light' [citation omitted] work with no concentrated exposure to pulmonary irritants; that involves nothing more complex than simple, routine tasks; and that requires no more than occasional contact with the general public, supervisors and coworkers."  Based on this RFC, the ALJ determined that Ms. Fuller could not perform any of her past relevant work and moved on to step five.[200]

The ALJ relied on the testimony of an "impartial vocational expert" to help determine whether or not there were a "significant number of jobs in the national economy that the claimant can perform" with the given RFC.[201]  The ALJ cited VE testimony that for someone of claimant's age, education, past experience, and RFC, there were 9900 jobs available as a maid, 3200 jobs available

---

[194] R. at 25-26.
[195] R. at 26.
[196] Id.
[197] Id..
[198] Id.
[199] 20 C.F.R. § 404.1545 (a)(1).
[200] Id.
[201] R. at 27.

as a mail clerk, and 3000 jobs available as an assembler. The ALJ credited VE Gels as testifying to these facts, however, the Court notes that VE Radke actually made this determination at the first hearing when presented an identical question. Relying on this testimony, the ALJ concluded that Ms. Fuller "is capable of making a successful adjustment to work that exists in significant numbers in the national economy" and is, therefore, not disabled.[202]

## G. Medical Evidence Submitted after the ALJ's Determination

Mr. Horn submitted additional medical evidence to the SSA on February 22, 2007, in support of Ms. Fuller's request for review with the Appeals Council.[203] This information was not available to the ALJ in issuing his decision, although it is now part of the record on appeal. The Court will not consider this evidence in evaluating the ALJ's determination.

STANDARD OF REVIEW

It is well settled that in reviewing an ALJ's decision, factual determinations are entitled to deference, while conclusions of law are reviewed *de novo*.[204] The court will uphold the ALJ's decision if it is supported by substantial evidence and free from legal error.[205] Substantial evidence means, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[206] "The ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade."[207] While factual determinations are entitled to deference, this deference requires the ALJ to "articulate at some minimum level, her analysis of the evidence."[208] However, "this does not mean that we will simply rubber-stamp the

---

[202] R. at 29.
[203] R. at 16, 536-37.
[204] *Prochaska v. Barnhart,* 454 F. 3d 731, 734 (7th Cir. 2006).
[205] 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).
[206] *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).
[207] *Berger,* 516 F.3d at 544.
[208] *Dixon v. Massanari*, 270 F.3d 1171,1176 (7th Cir. 2001).

Commissioner's decision without a critical review of the evidence."[209]

SOCIAL SECURITY REGULATIONS

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled.[210] The ALJ must consider: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[211] A finding of disability requires an affirmative answer at either step three or step five.[212]

ANALYSIS

Plaintiff argues that the ALJ's denial of benefits must be reversed or remanded because the decision: (1) was based on improper credibility determinations; (2) relied on an improper RFC determination; and (3) was not supported by substantial evidence at step five. Alternatively, plaintiff seeks a sentence-six remand under 42 U.S.C.S. § 405(g). The court will address each issue in turn.

**A. The ALJ's Credibility Determination**

Plaintiff argues that the ALJ's determination of her credibility was flawed for lack of specificity in violation of Social Security Ruling ("SSR") 96-7p. This ruling requires that the ALJ's credibility determination must "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and

---

[209] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).
[210] 20 C.F.R. §§ 404.1520, 416.920.
[211] *Id.*
[212] *Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  The Commissioner insists that the ALJ put forth many specific reasons which find ample support in the record.  Courts will not disturb an ALJ's credibility findings unless they are patently wrong,[213] in part because "an ALJ is in the best position to determine a witness's truthfulness and forthrightness."[214]

The ALJ specifically found "the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision."[215]  Ms. Fuller identified and challenged four of the ALJ's reasons.  These four reasons are:  the ALJ's finding that Ms. Fuller was bright, had some college credit, and  did well on mental status evaluations; her claims of  difficulty dealing with people coupled with her previous jobs requiring public contact; her dishonest testimony about past drug use, and; her testimony of severe back pain but her failure to seek follow up treatment.

Ms. Fuller's first challenge, that the ALJ relied on findings that she was bright, had some college credit, and performed well on mental status examinations, is off point.  It is true that the ALJ did make these findings, but he does not reference Ms. Fuller's credibility in connection with them.  Because he did not rely on these facts in making his credibility determination, they are not one of his "reasons set forth in the body of the decision."[216]

Ms. Fuller's second challenge carries more force.  The ALJ determined that because she has held jobs requiring public contact she cannot credibly claim difficulty interacting with people.  The Court agrees that Ms. Fuller has demonstrated the affirmative ability to get a job, but she has not demonstrated the ability to keep those jobs.  Moreover, Ms. Fuller presented corroborative evidence

---

[213] *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002).
[214] *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).
[215] R. at 28.
[216] *Id.*

of her difficulty interacting with others such as her hospitalization resulting from a physical confrontation and her testimony about aggressively confronting a coworker as a library clerk. These points certainly call into question the ALJ's blanket conclusion that Ms. Fuller can work with others and is not credible simply because of the type of job she has sporadically held in the past. Even so, the ALJ's credibility determination is sufficiently supported by the following two reasons.

Ms. Fuller challenges the ALJ's third reason that, regarding her drug use, Ms. Fuller "was not truthful about these habits initially and became more candid only after close questioning by the judge."[217] The Court finds this description of her testimony to be fair; at the second hearing, Ms. Fuller testified she had not used street-drugs for over seven years but later in the same hearing she admitted more frequent use when confronted with her previous admissions in the medical record. Because the record provides adequate support for this credibility determination, it will not be disturbed.[218]

Finally, Ms. Fuller challenges the ALJ's fourth reason, that Ms. Fuller's failure to pursue treatment for back pain casts doubt on her claim of severe pain. Ms. Fuller testified that she experiences severe back pain due to an automobile accident but the record lacks evidence of her pursuing treatment beyond one time, either separately or at her numerous visits to emergency rooms and general practitioners. In *Berger v. Astrue*, a similar credibility determination was upheld despite the existence of plausible reasons a claimant might not pursue follow up treatment.[219] The Seventh Circuit reasoned that while "much of Berger's failure to pursue treatment can be explained by his lack of insurance coverage or money to foot the bills[,] [r]egardless, an ALJ's credibility assessment will stand 'as long as [there is] some support in the record.'"[220] Accordingly, because there is some support in the record, this credibility determination

---

[217] R. at 26.
[218] *Jens v. Barnhart*, 347 F.3d 209 (7th Cir. 2003).
[219] 516 F.3d 539, 546 (7th Cir. 2008).
[220] 516 F.3d at 546 (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

will stand.

Because the ALJ articulated two adequate reasons that he discounted Ms. Fuller's credibility, his determination complied with SSR 96-7p. The ALJ's specific reasons for his conclusion – her dishonest testimony and failure to pursue treatment for alleged acute pain – are supported by the record. Therefore, the ALJ's credibility determination will not be disturbed.

## B. The ALJ's RFC Determination

At the heart of Ms. Fuller's argument is that the ALJ made an improper RFC determination because he failed to "include a narrative discussion describing how the evidence supports each conclusion."[221] The Court agrees. Ms. Fuller argues that the ALJ did not properly support his findings with evidence and that he improperly held her drug usage against her in determining her RFC. In response, the Commissioner maintains that the ALJ reasonably assigned less weight to some medical evidence, and met his burden of carefully evaluating the evidence. The Commissioner also argues that Ms. Fuller's challenge to the ALJ's substance abuse analysis is off point.

This Court recognizes that the ALJ's decision "need not address every single piece of evidence."[222] But as a minimum threshold, the ALJ's analysis must build "an accurate and logical bridge between the evidence and his findings."[223] When denying benefits, the ALJ is required to distinguish evidence which supports a finding of disability, especially where a medical expert "had insufficient evidence to reach a conclusion."[224] Because Ms. Fuller's mental impairments do not meet or equal a listing, a "detailed assessment" is required.[225] An ALJ must consider: "[h]istory, findings, and observations from medical sources (including psychological test results), regarding the presence,

---

[221] SSR 96-8p.
[222] *Sarchet v. Chater*, 78 F.3d 30, 307 (7th Cir. 1996).
[223] *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004).
[224] *Murphy v. Astrue,* 496 F.3d 630, 635 (7th Cir. 2007).
[225] SSR 85-16.

frequency, and intensity of delusions or paranoid tendencies; depression or elation; confusion or disorientation; ... psychophysiological symptoms, withdrawn or bizarre behavior; anxiety or tension."[226]

The ALJ's analysis is not detailed as required by the Rulings: it does not consider numerous medical records, and it does not distinguish evidence which conflicts with his determination. The amount of medical evidence the ALJ did not either acknowledge or analyze is overwhelming and as such is presented as a list.

1. Two visits to Dr. Tan in 1993.
2. Multiple treatments at Chatham in 1997 beyond initial visit.
3. November 2001 emergency room treatment and CT scan for severe headache and blurred vision.
4. September 3, 2002, conflicting GAF score of 50.
5. September 9, 2002, finding that Ms. Fuller seemed incapable of managing her own funds.
6. September 25, 2002, medical record conditioning MRFC on certain findings.
7. Two sessions at CMHC in May 2003 including a GAF of 50.
8. March, September, and October 2004 treatments at St. Margaret with psychiatric prescriptions.
9. February 18, 2005, inpatient care at EMHC (for ten days to two weeks).
10. Details from treatment notes from March-May 2005 psychiatric evaluations at EMHC.
11. May 16, 2005, note from Prairie Services physician stating Ms. Fuller cannot work.
12. June 2005 portion of psychiatric evaluation stating: "barely stable," and "could disintegrate."

Item number six refers to an analysis by state agency psychologist, Dr. Boyenga, who reviewed Ms. Fuller's medical records on September 25, 2002, and concluded that she was capable of performing simple, detailed tasks.[227] However, this finding explicitly relied on evidence that Ms. Fuller lived independently and supported her dependent child.[228] Dr. Boyenga also concluded that Ms. Fuller was capable of performing routine, repetitive tasks. However, this finding explicitly relied on evidence that Ms. Fuller could travel independently.[229] Dr. Boyenga assessed the following functional limitations: mild restriction of activities of daily living; moderate difficulties in maintaining social functions; mild

---

[226] *Id.*
[227] R. at 345.
[228] *Id.*
[229] *Id.*

difficulties in maintaining concentration, persistence, or pace.[230]  While the ALJ appears to have adopted Dr. Boyenga's functional analysis, he does not cite or evaluate Dr. Boyenga's findings.  Specifically, the ALJ did not distinguish or explain later evidence in the record that Ms. Fuller no longer lived independently or supported her child alone, and was incapable of traveling alone.

The ALJ's assessment does not consider the possibility that Ms. Fuller's diagnosis of bipolar can adequately explain many of the difficulties in the record; indeed, the ALJ conspicuously omitted bipolar disorder among his "Findings" of  Ms. Fuller's impairments.[231]  An ALJ is required to "consider impairments a claimant says [s]he has, or about which the ALJ receives evidence."[232]  Ms. Fuller presented a line of evidence consistent with her diagnosis of bipolar which the ALJ did not consider.  This evidence includes a history of: erratic behavior, arrests, confrontations, self medication with alcohol and marijuana, failure to adhere to treatment or medication regimes, recurrent crises, and an ability to obtain but inability to maintain employment.

The Seventh Circuit has remanded for an ALJ's apparent "lack of understanding of bipolar disorder."[233]  Citing relevant medical scholarship, Judge Posner pointed out chronic conditions which disable an individual from being able to work for significant periods of times do certainly require a finding of disability and "that is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment."[234]  The ALJ is free to consider and reject this interpretation of the evidence, but here, as in *Murphy v. Astrue,* the ALJ "failed to sufficiently explain his disregard of evidence suggesting disability."[235]  The *Murphy* Court logically suggested that when the testifying ME is unable to reach a

---

[230] R. at 357.
[231] R. at 28.
[232] 20 C.F.R. 404 1512(a).
[233] *Bauer v. Astrue*, 532 F.3d 606,609 (7th Cir. 2008).
[234] *Bauer*, 532 F.3d at 609.
[235] 496 F.3d at 635.

conclusion because of insufficient evidence, the requirement for an ALJ to distinguish contrary evidence is especially important.[236]  In this case, ME Schiff testified at length about his inability to reach a medical conclusion due to insufficient evidence and the ALJ did little to distinguish and often ignored Ms. Fuller's strongest evidence.

The ALJ took a one-sided view of the record and did not distinguish evidence suggesting Ms. Fuller's impairments were more severe.  For example, the ALJ concluded that Ms. Fuller "generally does well on mental status evaluations"[237] but he did not address strong evidence to the contrary such as: her May 2005 doctor note stating she cannot work; her February 2005 two-week inpatient treatment at EMHC; her May 2003 evaluation at CMHC including a GAF of 50; her May 2003 treatment notes indicating that she was "petrified" and had previously tried to get help but failed out of treatment twice; her conflicting GAF score of 50 on September 3, 2002; Dr. Rubens' opinion that she did not seem capable of managing her own funds; or Dr. Myrtle's opinion that she was "barely stable" and "could disintegrate." In *Bauer v. Astrue*, Judge Posner distinguished "a number of hopeful remarks" in a bipolar patient's record, from substantial medical evidence upon which an ALJ may rely.[238]  In that case, like here, evidence showed a claimant who cared for a child, performed some household chores, dressed appropriately, and received hopeful remarks in her medical record.[239]  But in *Bauer,* the Court found this evidence simply showed the claimant was, "not a raving maniac who needs to be locked up,"[240] and did not permit the ALJ to disregard evidence indicating a more severe impairment.

In addition to overlooking certain evidence, the ALJ erroneously relied on the fact that "claimant

[236] *Id.*
[237] R. at 26.
[238] 532 F.3d at 609.
[239] *Id.* at 608-09.
[240] *Id.* at 608.

34

currently works part-time at a library."[241]   However, nothing in the record supports this contention; Ms. Fuller testified twice about leaving her job after two weeks at EMHC's inpatient treatment facility due to a crisis.   As to her employment *prior to* the hearings, the Seventh Circuit has made clear that just because "someone is employed is not proof positive that [s]he is not disabled, for [s]he may be desperate and exerting [her]self beyond h[er] capacity, or h[er] employer may be lax or altruistic."[242]

Further, while ME Schiff testified at trial that claimant met the listing 12.09 "at times," the ALJ did not address the logical consequence of this testimony.   To meet this listing requires a finding of marked limitations in mental functioning so, consequently, the ME's testimony implies that Ms. Fuller suffered from marked limitations in mental functioning "at times."   The ALJ did not explain how or if this evidence factored into his determination.

It also appears the ALJ may have held Ms. Fuller's drug usage against her in determining her RFC, despite his determined efforts to elicit ME Schiff's medical opinion without regard to alcohol and drug use; the ALJ referred to cannabis as a "sticking point."[243]   In *Kangail v. Barnhart,* the Seventh Circuit explained that when evidence is ambivalent about the extent to which a claimant's condition would improve, were she to cease using drugs, the ALJ may not discount the plaintiff's symptoms.[244]   The Tenth Circuit articulated this same rule: "if the effects of a claimant's mental illness could not be separated from the effects of substance abuse, the abuse would be found *not* to be a contributing factor material to the disability determination."[245]   In this case, the ALJ's analysis implies he erroneously considered Ms. Fuller's drug usage in determining her RFC.

## C.  The ALJ's Step Five Determination

---

[241] R. at 26.
[242] *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995).
[243] R. at 26.
[244] 454 F.3d 627 (7th Cir. 2006).
[245] *McGoffin v. Barnhart*, 288 F.3d 1248, 1253 (10th Cir. 2002).

Ms. Fuller challenges the ALJ's reliance on VE Radke's testimony for two reasons. First, she argues that the ALJ's conclusion lacks substantial evidence because the ALJ credits VE Gels for testimony VE Radke supplied. Second, she challenges his conclusion as violating SSR 00-4p because of an actual conflict between the VE testimony and information in the DOT. Ms. Fuller contends that information in the DOT reveals maid and mail clerk jobs require more than occasional contact with supervisors and coworkers and assembler jobs require a higher level of reasoning than allowed by the ALJ's hypothetical. The Commissioner responds that it is too late to fault the ALJ for his reliance on VE testimony that is incompatible with the DOT when the incompatibility was not identified at the hearing. The issue here is if the actual conflict between the VE testimony and the DOT rises to the level of an apparent conflict sufficient to trigger an independent duty of the ALJ to inquire further at the hearing.

Turning to the first argument, this Court finds the ALJ committed only harmless error in crediting similar testimony to the wrong VE. VE Radke testified at the first hearing, in response to the original hypothetical, that Ms. Fuller could perform work as a kitchen worker/dishwasher, maid, mail clerk, and assembler. While the ALJ relied on this testimony, he credited VE Gels with providing it, who testified at the second hearing. Standing alone, this error is harmless.

Second, the DOT cannot always win when there is a conflict between it and a VE.[246] The Seventh Circuit has reasoned that, independent of the application of the Federal Rules of Evidence in a disability hearing, "experts should use reliable methods" because "every decision must be supported by substantial evidence"[247] and the opportunity to cross exam a VE is the plaintiff's safeguard. The question presented is if VE Radke's testimony resulted in a conflict so apparent that even when Ms. Fuller failed to identify

[246] *Donahue* v. Barnhart, 279 F.3d 441 (7th Cir. 2002).
[247] *Donahue,* 279 F.3d at 445.

it on cross examination, the conflict triggered an independent duty for the ALJ to inquire further.[248]

First, the ALJ must inquire if the VE's testimony conforms with the DOT.[249]  VE Radke did confirm this when questioned by the ALJ at the first hearing.  Second, if an apparent conflict exists, the ALJ must question the VE to resolve the conflict.[250]  When a claimant fails to reveal the conflict at a hearing in cross examination, a higher burden exists to prove that the conflict was so apparent as to trigger the ALJ's duty.[251]  In *Overman v. Astrue*, the Seventh Circuit stated that a plaintiff's failure to identify a conflict is "not without consequence."[252]  In this case, the jobs suggested by VE Radke seem to conform with the functional limitations proffered by the ALJ, thus no affirmative duty to inquire further as to an apparent conflict would have arose.  If Ms. Fuller or her counsel had made inquiries at the hearing revealing or alluding to the now identified conflict, then the ALJ would be required to attempt to resolve the issue.  Because that was not the case here, the ALJ was not required to inquire further to ensure exact compliance between the DOT and the VE's testimony.

---

[248] *Stark v. Astrue*, 278 Fed.Appx. 661 (7th Cir. 2008) (holding an ALJ may rely on the testimony of a VE when he confirms it is consistent with the DOT and there are no apparent conflicts).

[249] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

[250] *Stark*, 278 Fed. Appx. at 667.

[251] No. 07-2698, 2008 WL 4472095 ( 7th Cir. Oct. 7, 2008).

[252] No. 07-2698 at 6.

CONCLUSION

For the reasons set forth above, the Court finds that the ALJ's January 27, 2006, decision does not adequately evaluate or distinguish evidence contrary to his determination and remands this case for further proceedings consistent with this opinion. Further proceedings "can of course include the taking of additional evidence."[253]

**IT IS SO ORDERED**

**ENTERED: November 14, 2008**

    **Susan E. Cox**
    **UNITED STATES MAGISTRATE JUDGE**

---

[253] *Wilder*, 64 F.3d at 338.